**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lautaro CEA, Defendant–Appellant.**

No. 89–1796.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1990.

Decided Sept. 26, 1990.

As Amended Oct. 10, 1990.

882

Thomas M. Durkin, Asst. U.S. Atty. Office of the U.S. Atty. and Joan G. Fickinger, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Sidney I. Schenkier, Jerold S. Solovy, and Daniel Lynch, Jenner & Block, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is a "reverse buy" drug case developed by agents of the Drug Enforcement Administration ("DEA") in cooperation with Illinois State Police posing as drug sellers instead of in their more common role as drug purchasers.

In August 1988, the defendants Lautaro Cea [1] and Eduardo Quinto [2] were charged

---

1. Cea is a Chilean national.

2. Quinto is a Peruvian national. Quinto entered guilty pleas to Count I, conspiracy, and Count

with one count of conspiracy in violation of 21 U.S.C. § 846. Cea was charged with an additional seven counts of using a telephone to facilitate the commission of a felony in violation of 21 U.S.C. § 843(b) and one count of attempting to possess with intent to distribute a mixture containing cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.[3] At the conclusion of a bench trial in September 1988, the district court found Cea guilty on Count I and Counts III to IX. Cea was sentenced to a term of 109 months imprisonment and 5 years of supervised release.

Cea raises the issue of sufficiency of the evidence to sustain conviction as to various aspects of the charges: first, whether there was a conspiracy between Cea and Quinto to either use the telephone to facilitate the commission of a drug offense or to possess a controlled substance with intent to distribute; second, whether Cea attempted to possess a controlled substance with intent to distribute; and third, whether there was an underlying offense committed which Cea "facilitated by use of a 'communications facility.'" The final issue is whether the sentence imposed on Cea was in violation of law because the district court's sentencing discretion was allegedly based on improper criteria or criteria unsupported by the record.

## I. FACTUAL BACKGROUND

Because sufficiency of the evidence is the major issue we must examine the evidence in some detail.

Besides Cea and Quinto, the two other principal players were Francisco Medina, a confidential informant who posed as a drug trafficker, and Carlos Hevia, a lieutenant with the Illinois State Police investigations unit who posed as an individual from Miami with cocaine for sale. Cea and Medina had had some contact with each other prior to the cocaine negotiations in this case.

The reverse buy scheme began on January 19, 1988, when Medina registered in a hotel near O'Hare Airport in Chicago with Hevia registered in the adjoining room. The agents anticipated that any cocaine transaction would take place in Medina's room, so it was wired for video and audio sound. In addition, a device was installed on the telephone to record telephone calls. Some of the calls were made from the Chicago DEA office and were similarly recorded. After Medina registered in the hotel, he contacted Cea as a possible buyer. Cea came to Medina's hotel room that evening.

Medina and Cea got right down to business and settled on twenty kilograms of cocaine to be sold by Medina, at a price of $12,000 per kilogram for a total of $240,000. Cea asked about a sample of the cocaine and Medina advised Cea that Hevia, who was supposedly bringing the cocaine from Miami, was still enroute. Medina explained he could not leave the hotel room because he was expecting a call from Hevia as soon as he arrived in town. Cea then left.

On the following day, January 20, 1988, Cea called Medina at the hotel to see if he had heard from the person transporting the cocaine from Miami. Medina responded that Hevia was still a few hours away, and consequently he could not leave the hotel room to meet with Cea. An hour later Cea called Medina again and inquired if Medina would leave to discuss the transaction. Medina agreed. They met in Cea's car and then Medina returned to his hotel room. Later that day a DEA agent, who had Cea's home under surveillance, saw Cea leave his home and drive to the Gold Import Jewelry Store. About a half hour later the agent saw Cea leave the store with Quinto.

The next morning the agents put together a sham cocaine package and placed it in their undercover car at the hotel. Cea called Medina who advised him the cocaine

---

IX, attempting to possess cocaine with the intent to distribute, and was sentenced to a term of 87 months imprisonment and the forfeiture of $100,000 in cash and 50% of the net assets of his business, Gold Jewelry Imports.

**3.** On the government's motion, Count II, a telephone use count, was dismissed with prejudice.

had finally arrived. Medina asked if the money was ready. Cea answered that it was, but that he wanted to have a look at the cocaine first. In the afternoon Cea called Medina again. Medina advised Cea that Hevia was now present. Hevia got on the telephone and told Cea he had just arrived and was ready. Cea said the cocaine would have to be brought to his home. Hevia would not agree and stated he did not like the way the transaction was being conducted. Later, Cea again called and spoke to Hevia wanting to know what was Hevia's problem. Hevia said he was concerned about doing business with someone he did not know. Hevia suggested they discuss it further and invited Cea to the hotel, and Cea came. Cea said he knew they wanted to do business but needed a buyer. Cea explained that Quinto, the prospective buyer, was "well set," and had a jewelry store. They then discussed how to conduct the transaction. Hevia offered to show Cea the cocaine but Cea declined, saying Quinto did not want to receive the cocaine through an intermediary. Again Cea stated that he wanted Hevia to bring the cocaine to his home where Quinto could look at it and make the decision. Cea said that Quinto insisted the exchange occur at Cea's house to avoid possible violence. Cea explained that if Quinto was satisfied then they would go get the money. The discussion continued about the best way to conclude the transaction, Hevia insisting on the hotel and Cea expressing doubt that Quinto would agree to the hotel location. Hevia urged Cea to talk to "his partner" to get him to reconsider the location. Cea explained he did not have a partner, that he was working on a commission basis. Hevia urged Cea to talk further with Quinto before they met again.

They did meet again later that same day at the hotel and this time Cea brought Quinto along. Instead of meeting in Medina's room they met in the hall by the elevators outside Medina's room, but the meeting was surreptitiously recorded. Hevia complained he had been there three days and had yet to see the money. Quinto continued to insist that they conclude the transaction at Cea's home. Quinto lowered the amount of cocaine he wanted from twenty to ten kilograms. The meeting ended when Hevia finally agreed to complete the transaction at Cea's home that evening. Before the time scheduled for Hevia and Medina to arrive at Cea's home, Hevia changed his mind. It appeared to be too dangerous for them to go to Cea's home. Medina called to advise Cea, but Hevia took the phone using the preplanned excuse that they had seen a "detective car" near Cea's home. Therefore, the transaction had to be postponed until they agreed on a new location for the next day.

On the evening of the following day, Medina and Hevia called Cea and offered to bring ten kilograms to Cea and Quinto, and if the deal was satisfactory they would bring ten more. Cea responded that he needed to call "his partner" [Quinto], and the conversation ended. Medina did not hear from Cea, so he called Cea, complained about not hearing back from him, and expressed his fear that "they wanted to knock us off." Cea answered that the "guy I'm with, the one with whom I made the deal ... has a high caliber hit man" and that he, Cea, would be the first one to be "knocked off." Cea again tried to persuade Medina to bring the cocaine to his home where Quinto would come and evaluate it. A few minutes later Medina called Cea again to suggest an alternative procedure. He would bring only one kilogram. Cea refused and insisted that Medina bring the cocaine to Cea's home to be inspected. Cea maintained that he then would give Medina the money. The conversation ended with Cea's admonition to "take it or leave it," and Medina's refusal to do it that way.

A few hours later, Hevia called Cea from a pay phone saying he was near Cea's home with one kilogram and asked Cea to meet him at the phone booth. Cea still insisted that they execute the buy at his home, but finally relented and agreed to Hevia's proposition and said he would be over soon. Cea left his home about ten minutes later and was promptly arrested. No drug transaction was ever completed.

Later that evening federal agents executed a search warrant at Quinto's jewelry store where they found $16,000 in cash folded in small packets. Quinto cooperated by advising the agents that there was more money in his briefcase in his car. Quinto provided the combination to the briefcase lock and inside agents found $93,000 in cash.

Cea was found guilty in a two-day bench trial on all counts.

## II. SUFFICIENCY OF THE EVIDENCE

It is Cea's position that the evidence was insufficient on all counts to support his convictions. We shall consider the counts separately.

### A. Count I—Conspiracy

Count I charged that Cea and Quinto conspired to use a "communications facility" in violation of 21 U.S.C. § 843(b); [4] and alternatively charged a conspiracy "to knowingly and intentionally possess with intent to distribute cocaine" in violation of 21 U.S.C. § 841. [5] What is missing, Cea claims, is evidence of any agreement between him and Quinto to use the telephone to facilitate a drug offense as is required to prove a conspiracy in violation of 21 U.S.C. § 843(b). Cea likewise claims that there was insufficient evidence to establish beyond a reasonable doubt that he and Quinto agreed to possess the cocaine with intent to distribute as is required to show a violation of 21 U.S.C. § 841.

The defendant admits that phones were used as appears from the evidence related above, but he argues that there was no evidence that he and Quinto actually used the phone to communicate with each other. Cea concedes that the phones were used to communicate with the government agents, Medina and Hevia, but he argues an agreement between a defendant and a government agent cannot be a conspiracy. *See United States v. Escobar de Bright,* 742 F.2d 1196, 1200–01 (9th Cir.1984); *Sears v. United States,* 343 F.2d 139, 142 (5th Cir. 1965).

The government responds by citing the common standards that in considering a claim that a conspiracy has not been proved we must review the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and uphold the trier of fact's finding of conspiracy unless no rational trier of fact could have found a conspiracy based on the evidence. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1978). Count I charges a conspiracy in the alternative and it is the government's position that it has met the burden of proof under the count if it proves a violation beyond a reasonable doubt of either of the statutes pled in the alternative. *United States v. Soteras,* 770 F.2d 641, 646 (7th Cir.); *United States v. Muelbl,* 739 F.2d 1175, 1182–83 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 388, 83 L.Ed.2d 322 (1984). The government acknowledges that in reviewing the sufficiency of the evidence the initial issue is the nature of the conspirators' alleged agreement. In the context of a narcotics transaction, neither a buyer nor a seller can be guilty of a conspiracy to possess a narcotic with intent to sell merely because of the relationship created by that

---

**4.** 21 U.S.C. § 843(b) provides:

It shall be unlawful for any person knowingly or intentionally to use any communications facility in committing or causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communications facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communications facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

**5.** 21 U.S.C. § 841 provides, in pertinent part:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a controlled substance.

sale. *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir.1986). The government further argues that while mere association with conspirators is by itself insufficient to prove participation in a conspiracy, a single act may be sufficient evidence to prove a conspiracy if it can be inferred that the act was "intended to advance the ends of the conspiracy." *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983).

It is obvious from our recital of the evidence that the telephone was a very useful facilitator in these drug negotiations, not just as is directly revealed in the recording of conversations between Cea and the agents, but also from what is revealed indirectly and circumstantially about the underlying communications between Cea and Quinto. Cea's phone conversations with the agents circumstantially suggest numerous conversations between Cea and Quinto which gave rise to the conversations between Cea and the agents. Cea and Quinto were obviously in close touch with each other by phone, not by mail or by chasing back and forth in their automobiles between Cea's home and Quinto's store every time they had to communicate. The agents refused to go to Cea's home and Cea continued to relate Quinto's continuous refusal to meet elsewhere. The phone was obviously used.

■ A conspiracy conviction may be based on circumstantial evidence. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990) (quoting *United States v. Nesbitt*, 852 F.2d 1502, 1511 (7th Cir.1988), *cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989)); *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). We need not search for a written or even an express verbal agreement between these co-conspirators to use the phone for their cocaine business purposes. The phone played an important part in the illegal activities between Cea at home and Quinto at his jewelry store. The phone was the quick and convenient way to communicate. The evidence circumstantially is sufficient to show an unspoken

agreement between Cea and Quinto to stay in touch by phone while the cocaine negotiations, the amount of cocaine, the payment, and the exchange site were in a state of uncertainty. On January 22, Cea told Hevia that he would call Quinto to discuss Hevia's proposed method of exchange. Cea's conceded reliance on the telephone is more than circumstantial. We therefore conclude the evidence is sufficient in the conspiratorial use of the phone to sustain the conviction on the first alternative of Count I. With that determination we could affirm without examining the second alternative conspiracy charge, *United States v. Soteras*, 770 F.2d at 646, but it is helpful to an appreciation of the case to examine both alternatives.

■ The second alternative charged was a conspiracy between Cea and Quinto to knowingly and intentionally possess cocaine with intent to distribute it. Cea argues that there was no direct evidence of any agreement between Cea and Quinto and no record of conversation between them revealing a conspiracy. The evidence of the conspiracy was largely circumstantial. Circumstantial evidence may suffice. In this case it was voluminous and adequate, even leaving aside the direct evidence of the meeting on January 21, 1988, between Cea and Quinto and agents Hevia and Medina in the hotel hallway. At that meeting all discussed the cocaine transaction. Cea brought Quinto to that face-to-face meeting. The only problem for Cea and Quinto was in making sure their conspiracy was concluded successfully.

Cea was an active and important player in the conspiracy. He argues that he was only a broker on commission, and characterized himself that way in a conversation with Hevia. How Cea's actual role in the transaction should be characterized, however, is not to be left to Cea alone. Moreover, he was inconsistent when describing his status. In a later conversation on January 22, 1988, Cea referred to Quinto and told Hevia he wanted to call "my partner." Cea, however, argues that he was only a go-between, a broker, in the transaction between the agents and Quinto, with no

authority and no part in the transaction itself. It was Quinto alone, Cea argues, who was to possess the cocaine and decide what he would do with it, not him. Cea alleges that his situation is analogous to that presented in *United States v. Tyler,* 758 F.2d 66 (2d Cir.1985), but we fail to see the analogy because of the factual differences. In *Tyler* the defendant encountered an undercover police officer on the street who informed the defendant he "was looking for some good dope." They walked together until the defendant saw someone who might have drugs. The officer made a heroin transaction with the person the defendant had pointed out. Shortly thereafter the defendant asked the officer for some change. The officer gave him seventy-five cents, and the defendant was arrested. The *Tyler* court could find no conspiratorial agreement since the defendant did not know, among other things, where to find the seller or how much heroin the officer sought. *Id.* at 68–69. It was no more, the court held, than a chance encounter where the defendant only helped a willing buyer locate a willing seller. *Id.* at 70.

The Second Circuit has distinguished *Tyler.* In *United States v. Brown,* 776 F.2d 397 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), the defendant was called a "steerer" by an undercover agent, but he was actually more involved in the transaction. The defendant helped decide the terms of delivery. With a little more evidence than in *Tyler* the court found the possibility of a jury reasonably inferring an established working relationship. *Id.* at 403. In *United States v. Esdaille,* 769 F.2d 104 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985), the Second Circuit also declined to apply *Tyler.*

In the present case Cea was involved in all aspects of the negotiations. He was not just present at the scene because of a mere association with the other wrongdoer, Quinto. Cea worked diligently in trying to set up the transaction from which he expected to profit. Cea demanded, at Quinto's insistence, that the transaction be in Cea's own home with his own family present. It is of no importance how Cea

labeled the profit he expected to make, whether it be commission or something else. All that matters is his admission that he expected to profit from the transaction in accordance with whatever arrangement he had with his "partner" Quinto. Partners need not share equally. *See United States v. Manzella,* 791 F.2d 1263, 1265–67 (7th Cir.1987). The defendant in *Manzella* was more than a mere broker as he was essential and helpful to the transaction. Neither Manzella nor Cea were mere "brokers" because of the significant roles they played in the respective transactions. No one could have tried any harder than Cea to culminate the deal. His untiring effort is what requires us to affirm his conspiracy convictions.

**B. Counts III–VIII—Use of the Telephone**

Cea argues there was insufficient evidence to sustain a conviction on these counts. We have already discussed the extensive use of the phone in assisting the conspiracy drug offense negotiations. Nothing further is needed. We affirm the conviction on these counts.

**C. Count IX—The Attempt**

■ Cea was found guilty of attempting to possess cocaine with the intent to distribute it in violation of 21 U.S.C. § 841. This charge requires proof that Cea acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion. *United States v. Rovetuso,* 768 F.2d 809, 821 (7th Cir. 1985), *cert. denied,* 476 U.S. 1106, 106 S.Ct. 1951, 90 L.Ed.2d 360 (1986). Cea claims the government failed to prove either prerequisite beyond a reasonable doubt.

There has already been enough discussion of the facts to demonstrate Cea's active and important role in endeavoring to complete the transaction. *United States v. Reeves,* 794 F.2d 1101, 1104 (6th Cir.), *cert. denied,* 479 U.S. 963, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *United States v. Williams,* 704 F.2d 315, 321 (6th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78

L.Ed.2d 679 (1983). The facts amply demonstrate sufficient intent.

There is also a dispute, however, as to whether the government proved that Cea took a "substantial step" to further his intentions. The government claims Cea "took that substantial step when on the night of his arrest he actually left his home for the evident purpose of obtaining possession of the cocaine." Prior to his arrest the dispute about whether the transaction was to be completed in Cea's home or not and how it was to be accomplished was ongoing. Several hours after another phone discussion again had failed to resolve those matters, Hevia called Cea from a pay phone that he said was near Cea's home and informed him that he had one kilogram of cocaine in his possession. Hevia testified that he asked Cea "to come over and he wanted me to go over to his house and I said I would not and then he said that he would be over shortly." When Cea left his home a few minutes later after that last phone call he was arrested near his home.

■■■ The government argues that it is plain that Cea committed a substantial step in that "he was literally on his way to pick up the cocaine." The government correctly points out that when a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of the drug, the attempt offense is complete. *Williams*, 704 F.2d at 321; *United States v. Cafaro*, 480 F.Supp. 511, 515 (S.D.N.Y.1979). We have examined the cases cited by the government, but they offer little support for the government's position in the present circumstances. In *Williams*, 704 F.2d at 321, the defendant had actively solicited a narcotics sale by telephone and then within a short time appeared at a designated residence with the money to consummate the sale. There the police intervened after that substantial step had been taken. In *Cafaro*, 480 F.Supp. at 515, the defendant had telephone conversations with a narcotics seller who was cooperating with the government. It was agreed that the defendant would bring the money to the seller's apartment that evening to complete the sale. The defendant brought the money and was arrested in the lobby of the seller's apartment. The fact scenarios in both those cases amply support a finding that the substantial step requirement had been satisfied. The government correctly argues that it was under no obligation to wait until the sale was actually completed before intervening. That is of course true for if the sale has been completed it is no longer a mere attempt. Something less than a consummated sale suffices to prove an attempt provided it is a substantial step toward completion.

The only evidence we find in the record about a substantial step is set forth above in the testimony of Hevia. We read it as establishing that when Cea left his home he very likely intended to meet Hevia and pick up the drugs. Nonetheless, we cannot say on this record that it was so likely that it was established as a substantial step beyond a reasonable doubt. The evidence does not even show that Hevia told Cea the actual location of the pay phone from which he was calling so that they could meet there, only that it was near Cea's home. No specific location was designated. We do not even know which way Cea may have been headed from his home, toward the pay phone or not. We do not know exactly where he was arrested in relationship to his home. We do not know if he had the money to complete the purchase and thereby obtain possession of the cocaine. The government does not have to wait until the transaction is complete but it needs more evidence of a substantial step than what it produced at trial. If the government had been more patient and deferred Cea's arrest until it could be said with assurance that Cea was approaching Hevia at the pay phone, there would not be this substantial step problem. The government failed to elicit from Hevia's testimony or from other officers involved in Cea's arrest all the facts that might have enabled a reliable determination that Cea had taken a substantial step. Supposition will not suffice. We cannot give the government a second chance to more fully develop its

evidence. The attempt conviction is reversed.

### III. SENTENCING

■ The final issue is Cea's request for resentencing because the trial court allegedly abused its discretion in sentencing Cea. Quinto pleaded guilty and received a sentence of 97 months, while Cea was sentenced to 109 months after he proceeded to trial on his "not guilty" plea. The trial judge found that Quinto had a relatively "inactive role" compared to Cea, and that Quinto cooperated with the government. Quinto, however, did not testify for the government. Quinto also forfeited considerable cash and property to the government. Cea, however, had no funds to forfeit, and therefore argues he should not be punished for lacking sufficient wealth for the government to confiscate.

The trial judge, who has wide discretion, adequately explained his sentence. *See United States v. Bush*, 820 F.2d 858, 862 (7th Cir.1987). Although Cea's argument is not totally meritless we find no abuse of discretion. Cea does not allege that his sentence, which was imposed within the appropriate guideline range, resulted from a violation of law or an incorrect application of the Sentencing Guidelines. We noted in *United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir.1990), "[t]here is no statement in the legislative history suggesting that sentences within the Guidelines should be reviewed because of a claim that a particular sentence is draconian or too lenient." As in *Guerrero*, the defendant's disparity of sentence argument is eclipsed by the district court's imposition of a sentence within the correct guideline range. If Cea is arguing that Quinto got less than he may have deserved Cea gains no similar advantage by reason of Quinto's good fortune. They both deserved substantial terms of confinement.

We AFFIRM Cea's convictions on Count I and Counts III through VIII, and we REVERSE Cea's attempt conviction under Count IX. While the 109 month sentence imposed under Count IX was to run concurrently with the identical sentence imposed under Count I, we believe that prudence and fairness dictates that we vacate all of the sentences and remand for appropriate resentencing. *See United States v. DiFrancesco*, 449 U.S. 117, 133–39, 101 S.Ct. 426, 435–39, 66 L.Ed.2d 328 (1980); *United States v. Covelli*, 738 F.2d 847, 862 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *United States v. Jefferson*, 714 F.2d 689, 707 (7th Cir. 1983). We therefore VACATE all of Cea's sentences and REMAND to the district court for resentencing.